UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
BRITTNEY WITHERSPOON,

                                Plaintiff,

                   -against-

SIA PARTNERS U.S., INC., SIA PARTNERS,
and DANIEL CONNOR,

                            Defendants.

--------------------------------------------------------------------X

**COMPLAINT**

Case No.  21-cv-5555

Plaintiff BRITTNEY WITHERSPOON ("Ms. Witherspoon"), by and through her attorneys, LEVY RATNER, P.C., alleges as follows upon information and belief against Defendants SIA PARTNERS U.S., INC. ("Sia"), SIA PARTNERS, and DANIEL CONNOR ("Mr. Connor") (collectively, "Defendants"):

## NATURE OF ACTION

1.       This is an action to remedy discrimination in employment because of race and sex and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") as amended, 42 U.S.C. §§ 2000e, *et seq.*; the Equal Pay Act of 1963 ("EPA") as amended, 29 U.S.C. § 206(d); the New York State Human Rights Law ("NYSHRL"), New York Executive Law §§290, 296 and 296(6); New York Labor Law § 194; and the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code §§8-101, *et seq.*  This action seeks declaratory and injunctive relief, back pay, front pay, and compensatory and punitive damages both to secure future protection and to redress deprivation of Ms. Witherspoon's rights under these federal, state, and local laws.

2.       This lawsuit concerns a pattern of sex and race discrimination that Sia and Sia's Chief Executive Officer ("CEO") Mr. Connor, directed at Ms. Witherspoon.  Sia is a management

1

consulting firm and, prior to March 2019, nearly all of Sia's services offerings centered around regulatory and compliance matters in the financial services industry, particularly anti-money laundering ("AML"). This is still applicable for Sia's New York office (Sia's flagship U.S. office), which generates most of its revenue from AML and other regulatory-related projects. Sia is the U.S. subsidiary of Sia Partners, an international management consulting firm headquartered in Paris, France, with 31 offices across 18 countries. Sia is managed and operated independently of the global operation, and it is dominated by Mr. Connor, whose mercurial, abusive and retrograde views on gender and racial inclusivity have set the tone for the U.S. organization.

3.      Ms. Witherspoon is a Black woman who is a licensed attorney and a Certified Anti-Money Laundering Specialist ("CAMS"), the gold standard in AML certifications and the top credential Sia markets in its proposals for new client engagements. Before joining Sia, Ms. Witherspoon worked for two major financial services companies, BlackRock and Morgan Stanley, where she performed AML-related work that laid the foundation for her expertise in this intricate and increasingly important area of financial services regulation. Sia hired Ms. Witherspoon to leverage and expand that expertise, and she has done so throughout her tenure at Sia. Ms. Witherspoon has consistently been staffed on complex projects for Sia's most important clients and billed out to them at rates that are commensurate to her expertise and her contributions to highly-specialized AML projects.

4.      Ms. Witherspoon's salary and promotional history do not reflect her high level of performance. Ms. Witherspoon's salaries, bonuses, and promotions have lagged behind white and male peers, and colleagues whose credentials, experience, and performance did not match her record. This discrepancy is especially striking given that Ms. Witherspoon was staffed on more demanding projects and billed out and utilized at higher rates, while being compensated less and

promoted behind her peers and colleagues. This discrepancy, which persists to this day, is a function of Mr. Connor's discrimination against Ms. Witherspoon as a Black woman.

5. Mr. Connor's improper treatment of Ms. Witherspoon began within days of her hire by Sia. When Mr. Connor introduced Ms. Witherspoon and Theodore Davidson ("Mr. Davidson") (a Black colleague who was hired two weeks before Ms. Witherspoon) to the New York office, he publicly characterizing them as diversity hires. Mr. Connor was subsequently overheard on multiple occasions characterizing Ms. Witherspoon as a "sassy Black girl" or "sassy Black woman." Mr. Connor admitted that this racial trope was the reason he was initially reluctant to staff her on client projects. Mr. Connor later went out of his way to publicly berate, demean, and humiliate Ms. Witherspoon, improper treatment that accelerated in tone and frequency after Ms. Witherspoon challenged her discriminatory treatment by Sia. After Ms. Witherspoon filed a formal complaint, Sia and Mr. Connor retaliated against Ms. Witherspoon, including by depriving her of opportunities to advance her career.

6. Ms. Connor's treatment of Ms. Witherspoon is consistent with a pattern and practice of sex and racial bias he has demonstrated throughout his leadership of Sia. Women, and Black women in particular, have suffered from the discriminatory and hostile work environment that Ms. Connor encouraged at Sia. Black women at Sia have had remarkably similar negative experiences. Whether they are experienced professionals or entry level administrative assistants, Black women have suffered discrimination and marginalization at Sia, just like Ms. Witherspoon. After Ms. Witherspoon's complaint, Sia belatedly implemented a diversity task force to improve its terrible track record with women and racial minorities. But with Mr. Connor in charge and setting the tone, nothing has changed. Ms. Witherspoon's discriminatory treatment persists to this day, and Black women still find Sia to be a hostile place to work.

7.      Sia's problematic work environment also is evidenced by its inadequate human resources capabilities and sham complaint process.  Sia's human resource ("HR") function is effectively controlled by Mr. Connor, and Sia has outsourced its employee complaint mechanism to a third party, ADP TotalSource ("ADP") that failed to adhere to the written procedures that govern employee complaints.  When Ms. Witherspoon filed a formal complaint, it withered unattended for months while the discrimination she faced continued.  Ms. Witherspoon's complaint then was outsourced to a second third party, the law firm Littler Mendelson, which purported to conduct an "investigation" into her allegations.  That "investigation" failed to include interviews of key witnesses identified by Ms. Witherspoon, and over a year after Ms. Witherspoon's complaint was filed, it was summarily dismissed.  This sham process aggravated and perpetuated the harm inflicted on Ms. Witherspoon.  It did not remedy the complaint; she continued to suffer discrimination and retaliatory treatment.

8.      As a result of Defendants' discriminatory and retaliatory treatment, Ms. Witherspoon has lost pay, has been set back in her career, and has suffered physical, emotional, and reputational harm, among other damages.

9.      After Mr. Witherspoon unsuccessfully sought recourse through Sia's HR procedures, she filed a complaint with the New York City Commission on Human Rights (the "Commission") in February 2020 against Sia and Mr. Connor for race and sex discrimination, including creating a hostile work environment and retaliating against her for opposing discrimination. Sia answered the complaint in April 2020, and Ms. Witherspoon filed a rebuttal with the Commission in July 2020. Ms. Witherspoon requested a 'Right to Sue' letter to proceed to court to resolve her claims.

## JURISDICTION AND VENUE

10.      The jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C.

4

§216(b), 28 U.S.C. §§1331 and 1343(a)(3)-(4), and 28 U.S.C §1367(a) for claims arising under the NYSHRL, New York Labor Law and NYCHRL, based on supplemental jurisdiction over claims that arise from a common nucleus of operative facts and are so intertwined with other matters pending before the Court as to make exercise of supplemental jurisdiction appropriate. Jurisdiction is further invoked pursuant to 28 U.S.C. §§2201 and 2202, as Plaintiff is seeking a declaratory judgment concerning Defendants' conduct in violation of law.

11.     Pursuant to 28 U.S.C. §1391(b), venue is proper in the United State District Court for the Southern District of New York because most of the events giving rise to the claims occurred within this District and Defendant Sia Partners is headquartered within the District.

12.     Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII. This action is founded on a verified complaint filed with the New York City Commission on Human Rights (Complaint No. M-E-ORS-20-83285-E) and cross-filed with the U.S. Equal Employment Opportunity Commission ("EEOC") (Charge No. 16F-2020-00133C). The lawsuit is commenced within ninety (90) days of Plaintiff's receipt of a notice of right to sue from the United States Department of Justice. A copy of the notice is annexed hereto as Exhibit "A."

## JURY DEMAND

13.     Plaintiff hereby demands a trial by jury on all issues properly triable thereby.

## PARTIES

14.     Ms. Witherspoon is a Black woman who is employed as a consultant with Sia and is under the authority of Mr. Connor, the CEO of Sia.

15.     Sia Partners is a global consulting firm headquartered in Paris, France, which was founded in 1999 by Matthieu Courtecuisse ("Mr. Courtecuisse"), who is currently the global CEO and majority stakeholder. Sia Partners' U.S. business operations began in 2012, with the

acquisition of OTC Conseil Americas, Inc., the New York branch of OTC Conseil Group. Prior to

Sia's U.S. acquisitions of Loft9, LLC in March 2019; Gartland & Mellina Group Corp ("GMG"),

effective in August 2019; and Caiman Consulting, LLC, effective in December 2019, Sia had less

than 100 employees, approximately 65-80 people in the New York office, and the remaining in

Sia's Houston, TX, and Charlotte, NC offices. Sia now has offices in New York, NY; Denver, CO;

Charlotte, NC; Seattle, WA; San Jose, CA; and Houston, TX, Baltimore, MD, and Chicago, IL,

and employs roughly 350 people. Sia is also planning to open a new office in Los Angeles, CA.

16.     Mr. Connor is the CEO of Sia and has authority over every employee hired directly

by Sia, including Ms. Witherspoon. Mr. Connor determined Ms. Witherspoon's disparate pay,

discriminatorily denied her a promotion, subjected her to hostile treatment, and retaliated against

her for opposing discrimination.

## STATEMENT OF THE FACTS

### A.     Plaintiff's Qualifications, Experience and Contributions to Sia

17.     Ms. Witherspoon has been an employee of Sia, in its New York City office, since

March 6, 2017, when she was hired as a management consultant.  Ms. Witherspoon was the first

and only Black woman consultant in all of Sia's U.S. offices from March 2017 – March 2018.

18.     Sia's New York office specializes in financial services, primarily relating to

compliance matters. Prior to joining Sia, Ms. Witherspoon had two years of AML and compliance

experience at two large financial institutions. Most of her colleagues of her same title did not have

prior experience directly relating to AML, compliance, or financial services before joining Sia.

19.     Ms. Witherspoon is a licensed attorney admitted to the bar in the state of New York.

Most of her colleagues at Sia hold only a bachelor's degree. Ms. Witherspoon is also CAMS

certified.  Upon information and belief, Ms. Witherspoon is one of only two licensed attorneys

among the consultants employed by Sia U.S., and she is one of only a few who are CAMS certified. In spite of her greater qualifications (which Sia heavily markets in proposals for new client engagements) and greater responsibilities on major consulting projects, several male and White female peers and/or colleagues have received higher salary increases, promotional increases or bonuses than Ms. Witherspoon, as alleged further below.

20.     Ms. Witherspoon uses "peers" to refer primarily to male employees with whom she shared the title of consultant when they joined Sia at or around the time as Ms. Witherspoon.  Due to Sia's inconsistent hiring and post-hiring practices, some employees (whom Ms. Witherspoon refers to as colleagues; a term she also uses, generally, to refer to employees of Sia and Sia Partners of various titles) are not true peers, even though they may have or had the same title, because their professional profile (including level of education, years of relevant work experience, professional credentials, marketability, expertise, utilization and roles on client projects) is objectively lower than hers. Some of these peers and colleagues have recently been promoted to the title of manager (one title higher than Ms. Witherspoon's current title of supervising senior consultant, which was implemented in January 2019), but the disparities in their compensation and treatment began when they shared the same consultant title. In addition, Ms. Witherspoon's peers and colleagues and comparators do not include those who were hired by the companies that Sia acquired in 2019, because those individuals' pay structures and promotion trajectory were not set by Sia and Mr. Connor, and their post-acquisition promotions are almost exclusively determined by the partners, project managers, and career advocates of the legacy companies.

21.     Ms. Witherspoon's most direct comparator is Stephen Perez, a white male, who was hired by Sia as a Consultant about three months after Ms. Witherspoon.  Mr. Perez was paid more than Ms. Witherspoon upon hire, even though Ms. Witherspoon had an advanced degree.

Mr. Perez and Ms. Witherspoon performed substantially equal work on projects requiring substantially equal skill, effort, and responsibility, although Ms. Witherspoon generated more revenue for Sia than did Mr. Perez. The work performed by Ms. Witherspoon and Mr. Perez was performed under similar working conditions, namely in an office environment either at Sia's offices or the offices of the client(s) to whom their consulting work was billed.  Mr. Perez received a higher 2017 bonus than Ms. Witherspoon. Both were awarded the same 2018 appraisal grade, both were promoted in December 2018, but Mr. Perez received a higher 2018 bonus and higher 2018 salary increase than Ms. Witherspoon. In 2019, when Mr. Perez left Sia, he was earning more than $16,000 per year more than Ms. Witherspoon.

22.     Due to her legal and compliance background and AML subject matter expertise, Ms. Witherspoon has consistently been placed in the most challenging roles for clients and, because of this, has generally been billed to clients at a higher rate than some of her peers and colleagues. Clients face material financial, legal, operational, and reputational consequences if they are not compliant with applicable laws and regulations. Due of these risks, clients want qualified specialists to handle their most difficult legal and compliance matters. Because of Ms. Witherspoon's professional profile, she has been selected for every client project for which she has ever interviewed. Her responsibilities have included providing regulatory advice and devising corrective action strategies to address a client's compliance with AML laws and regulations; reviewing service-level agreements and other contracts; drafting policies, procedures, and training documents; acting as a correspondent banking specialist; overhauling the client's customer identification program ("CIP") (a critical component before onboarding a new banking customer); conducting internal Know Your Customer ("KYC") trainings for Sia and client employees; being quality control manager in connection with the client's KYC periodic review, reconciliation, and

identifying politically-exposed persons ("PEP") projects; and assisting clients with creating a global-minimum-standard to synchronize policies across offices in different countries.  At a major Sia client, Scotiabank ("Scotia"), Ms. Witherspoon handled various projects, including revising the policies and procedures of Scotia's compliance team, consolidating the transaction review procedures for specific Scotia products, and leading CAMS study sessions and trainings to help other team members become certified. Ms. Witherspoon's internal performance at Sia also reflected her diligent work ethic. This internal work, ranging from attending working groups (internal monthly meetings to discuss current events in different industry and identify potential business opportunities), to writing articles on regulatory issues that are used for marketing purposes (which Sia calls "IPs"), is considered in granting raises and heavily considered in employees' end-of-year appraisals.  Ms. Witherspoon has written more IPs than her peers and colleagues, particularly those in the compliance working group, which Mr. Connor leads, and historically she has attended more working groups.

### B.    Early Indicators of Sex and Race Bias

23.    Mr. Connor's conduct favors heterosexual men and reveals his preferences for women who conform to traditional gender roles, including that women should be submissive.

24.    Immediately upon Ms. Witherspoon joining Sia, Mr. Connor expressed racial, sex-based, and intersectional (sex and race) bias against her. Approximately two weeks after Ms. Witherspoon was hired, Mr. Connor introduced her as the new "diversity" hire in front of the entire New York office at the quarterly business update. Mr. Connor said that Sia had to "focus on diversity as evident by our new hires." He then pointed to Ms. Witherspoon and Mr. Davidson. Mr. Connor typically introduces new hires by describing their professional background. With Ms. Witherspoon and Mr. Davidson, he did not do that.  Instead, he humiliated Ms. Witherspoon by

drawing sharp attention to her status as a Black woman.

25. Mr. Connor subsequently made stereotypical and derogatory comments about Ms. Witherspoon as a Black woman. Mr. Connor described Ms. Witherspoon to Sia's former IT officer, Maxim Pankov ("Mr. Pankov"), a White man, as a "sassy Black woman" in or around the Spring of 2017. Mr. Connor further stated that because of this, he had doubts and concerns about her. Mr. Connor told Mr. Pankov that Ms. Witherspoon was not immediately placed on a project after she was hired – *i.e.*, Ms. Witherspoon remained "on the bench" – because of these concerns.

26. In or around July-August 2018, Mr. Connor repeated his derogatory characterization of Ms. Witherspoon as a "sassy Black woman" to Jack DeGiulio ("Mr. DeGiulio") (a White man), who was her project manager on Société Générale's ("SocGen") Corrective Action project, from April 2018 – August 2018. Mr. Connor made this comment during a meeting at SocGen's office.

27. Ms. Witherspoon alleged this conduct in her complaint to the Commission. Sia, tellingly, did not deny that Mr. Connor made these comments in its response. Instead, Sia resorted to the proverbial "some of my best friends are Black" defense. According to Sia, because Mr. Connor's wife is part-Black, this means he "clearly does not have biases against African American women." Mr. Connor's marriage has no relevance to his conduct in the workplace. If Mr. Connor's marital relations were relevant here, it would be worth noting that Sia employees have witnessed Mr. Connor screaming at his wife on multiple occasions, in view or in earshot of others. For example, Cynthia O'Keeffe witnessed Mr. Connor screaming at his wife on phone, despite knowing that she and others could clearly hear. This aligns with the pattern of behavior of Mr. Connor openly directing hostility toward Black women at Sia.

28. Ms. Witherspoon experienced Mr. Connor's discriminatory mindset about gender

roles in September 2017 when she attended the Sia Partners' seminar, an annual conference and social gathering that brings together employees from all of Sia Partners' European and some of its other worldwide offices. In large part because of the culture set by Sia's parent, Sia Partners and Mr. Courtecuisse, which reflects a more relaxed French attitude about certain office norms, Sia and Sia Partners accepts and even encourages romantic relationships and close friendships between colleagues. Such relationships often develop during the seminars, given the social nature of much of the event. Ms. Witherspoon developed such a relationship with a peer in Sia Partners' Paris office during the 2017 seminar. Mr. Courtecuisse, Sia Partners' global CEO, and many of the partners based in Paris knew about and encouraged this relationship. Several men in the New York office have had similar relationships on seminars or at other Sia functions. Those relationships never caused Mr. Connor any concern. By contrast, Mr. Connor was bothered by Ms. Witherspoon's relationship, denigrating her repeatedly through inappropriate and shaming comments.

29.     For example, a video of the European seminar was played on the last day of the conference that included clips of Sia and Sia Partners colleagues socializing. One clip included Ms. Witherspoon and the colleague from the Paris office, with whom Ms. Witherspoon had a relationship. After the video was shown, Mr. Connor approached her and said in a sarcastic and shaming tone, "Brittney, even though you did not win The Challenge [a competition based on new business ideas], you won the seminar."

30.     After the seminar, Mr. Connor continued to make comments with the intention and result of shaming Ms. Witherspoon for her private sexual conduct. For example, Mr. Connor was overheard saying that Ms. Witherspoon enjoys and is good at playing "tonsil tennis."

31.     On May 2, 2019, at Sia's New York townhall meeting, an event that also served as

11

a welcome party for the company Sia had just acquired, GMG, Mr. Connor expressed disappointment to Ms. Witherspoon that the two companies were not socializing.  When Ms. Witherspoon responded by saying that everyone was probably a bit shy, Mr. Connor said, "well, you're not shy. I've seen video of you." Nearly two years after the European seminar, Mr. Connor was still making crude comments about that video.  The men in Sia, particularly the New York office, who had relationships on seminars were not subjected to similar jokes and sexualized comments from Mr. Connor.

### C.    Hostile Work Environment

32.    Mr. Connor intentionally created hostile situations and undermined Ms. Witherspoon's work performance to confirm his preexisting racial and gender bias. For example, Mr. Connor refused to acknowledge various initiatives Ms. Witherspoon started (*e.g.*, transaction review initiative at Scotia; CIP initiative at SocGen).  Instead, he gave men credit for her work. Mr. Connor forced Ms. Witherspoon to stop servicing the client's work to do secretarial tasks on behalf of male employees.  Mr. Connor intentionally accused Ms. Witherspoon of wrongdoing even though he knew there was no legitimate basis for the accusation. Lastly, he internally interfered with and changed Ms. Witherspoon's work product, without the client's consent and without regard for the approach that the client previously approved.  Each of these examples of his hostility toward Ms. Witherspoon are detailed more fully below.

33.    Ms. Witherspoon took sick leave from October 10 – October 16, 2017. She returned to work on October 17, 2017. Two days after she returned to work, and three weeks after the above-described European seminar, Mr. Connor began harassing her.  On October 19, 2017, Mr. Connor called Ms. Witherspoon to his temporary desk at Scotia's office and asked her a question about aspects of the transaction review initiative, which entailed implementing a 90-day review of

Scotia's customers' bank account activity, with which he had no prior involvement. When Ms. Witherspoon began to answer his question, Mr. Connor said loudly in front of several colleagues, "Brittney, don't argue." After that incident, Mr. Connor began micromanaging Ms. Witherspoon, yelling at her and berating her in front of her peers and colleagues on a daily basis.

34.     October 19, 2017, while at Scotia, Mr. Connor came to Ms. Witherspoon's desk on the trading floor and berated her in front of her colleagues, falsely asserting she had gone behind his back and changed certain language regarding the transaction review escalation process.  A couple of days earlier, Mr. Connor had stood at Ms. Witherspoon's desk and told her to make the language "sound pretty." Mr. Connor directed Ms. Witherspoon to make this change without the client's approval and without regard for the fact that hundreds of documents that were already completed had to be revised, with less than two weeks before the October 31, 2017 project deadline, to account for the change to Ms. Witherspoon's work product. Ms. Witherspoon showed Mr. Connor the three samples of the new language and Mr. Connor gave her two thumbs up, which Ms. Witherspoon understood to mean approval. After Mr. Connor approved the new language, Ms. Witherspoon used it in subsequent emails and documents she sent to him, and Mr. Connor made no objections. Later that night, Mr. Connor abruptly began screaming at Ms. Witherspoon about changing the transaction review language. When Ms. Witherspoon responded that she was using the language he told her to use, he once again yelled, "Don't argue!"

35.     Ms. Witherspoon raised this allegation with the Commission, and Sia did not deny it. Sia's answer to the Commission does not say why Mr. Connor berated Ms. Witherspoon and undermined and interfered with her work, despite approving the language at Ms. Witherspoon's desk and not objecting to it when she included it in two subsequent emails to him.

36.     In December 2017, when a male colleague, Roman Ozimko ("Mr. Ozimko"),

canceled his attendance at an optional presentation skills training, Ms. Witherspoon (not Mr. Ozimko) was tasked by Mr. Connor with finding his replacement.  There was no legitimate reason for Mr. Connor to give Ms. Witherspoon this administrative task, which took her away from her responsibilities for the client.   Nonetheless, she diligently attempted to find a replacement in accordance with Mr. Connor's request.  Ms. Witherspoon immediately found not one, but two replacement options (Asaad Altaai and Mr. Davidson). Mr. Connor was aware of this because he was copied on the relevant email chains. Despite this, on December 15, 2017, while at Scotia, Mr. Connor cornered Ms. Witherspoon in a phone booth, put his hand in her face and abrasively told her that she needed to "be successful" when given tasks. This hostile incident confirmed for Ms. Witherspoon that Mr. Connor was biased against her.

37.    Ms. Witherspoon raised this allegation with the Commission, and Sia did not deny it. Sia's answer to the Commission offered no explanation for why Ms. Witherspoon was singled out for this clerical task or why Mr. Connor harassed her in a phone booth for not finding Mr. Ozimko's replacement, when he was aware that she in fact found replacements for him.

38.    After this troubling incident, Ms. Witherspoon emailed Mr. Connor on December 15, 2017, and asked to meet with him to discuss her place in Sia and to clear the air between them. Mr. Connor refused to meet, instead responding, "I give feedback as it comes up!"

39.    Mr. Connor's hostility towards Ms. Witherspoon escalated in 2018.  On January 11, 2018, also at Scotia, Mr. Connor called Ms. Witherspoon's personal cell phone and screamed at her for more than five minutes. He inexplicably called her a failure because other people cancelled their attendance at an optional presentation skills training. Ms. Witherspoon had not canceled, and in any event, she had nothing to do with others' decision to cancel. Mr. Connor nevertheless took his anger and frustration out on Ms. Witherspoon. Once Mr. Connor calmed

down, he admitted that he was aware that he can be unreasonable, and this has resulted in him "burning bridges."

40.     Ms. Witherspoon raised this allegation with the Commission, and Sia did not deny it. Sia failed to explain to the Commission why Mr. Connor called and verbally attacked Ms. Witherspoon, instead of calling the people who cancelled their attendance.

41.     On March 18, 2018, while on Sia's North American seminar in Miami, Mr. Connor publicly accosted Ms. Witherspoon in the lobby of the hotel where the conference took place. Even though she was visibly ill and told Mr. Connor that she was unwell, Mr. Connor chastised her, incorrectly, about her working group attendance. On the plane ride home that same day, Mr. Connor inappropriately discussed Ms. Witherspoon's working group attendance with Mr. Davidson (who was not her manager and had no "need to know" this information) and told him that she was not serious about her career because she missed one working group.  In addition to being inappropriate, that comment was false.  Ms. Witherspoon attended significantly more working groups than the average Sia employee, having attended 85-90% of all working groups since she joined Sia. Most of Ms. Witherspoon's peers and colleagues rarely or never attend them, but this has not been used against them.

42.     Ms. Witherspoon raised this allegation with the Commission, and Sia did not deny it.  Sia's answer to the Commission did not address Ms. Witherspoon's allegations that her colleagues routinely missed working groups with no repercussions from Mr. Connor; why Ms. Witherspoon was treated differently from her peers and colleagues and publicly humiliated for missing only one working group; or that Mr. Connor increased the salary, around July 2018, of one of Ms. Witherspoon's colleagues, Quentin Pradere ("Mr. Pradere"), a White man, by approximately $10,000, to incentivize him to return to the working group.

43. Mr. Connor's abusive treatment of Ms. Witherspoon continued several months later when he falsely criticized her written work. Ms. Witherspoon worked on several IPs with Mr. Connor and Lauren Pickett ("Ms. Pickett") (Sia's AML director) early in her tenure at Sia, and they never complained about the quality of her work.  On June 19, 2018, less than five minutes before the start of a working group meeting, Mr. Connor called Ms. Witherspoon into his office and told her – within earshot of many others – that the reason an IP she wrote had not been released in more than a year was because Ms. Pickett said it was "not up to standard." Mr. Connor admitted he had not read it himself.  Ms. Pickett had not read it either, belying Mr. Connor's false comment, which is why she stood outside Mr. Connor's office looking shell-shocked as Mr. Connor was unjustly criticizing Ms. Witherspoon's work. Without previously asking Ms. Pickett any questions or knowing any details about the IP in question, or inviting her into his office so they all could discuss the matter, Mr. Connor used this as an opportunity to humiliate Ms. Witherspoon and falsely discredit her work. Upon information and belief, Mr. Connor has not falsely maligned the work of white male consultants.

44. On June 27, 2018, during a meeting with Mr. Connor, Ms. Pickett, and Bibi Bhagwandin ("Ms. Bhagwandin") (Sia's HR director from 2012-2020) to discuss the IP incident on June 19, 2018, Mr. Connor cursed at Ms. Witherspoon (at one point yelling "bullshit"), insulted her (including stating that she does not have a good memory), and threatened her for having complained about his mistreatment of her, saying that he was "not going to forget about this for a long time." When Ms. Witherspoon asked Mr. Connor what that meant, expressing discomfort over such a threat, Mr. Connor refused to provide an explanation. Mr. Connor ended the meeting by saying that "if something like this happened again" (i.e., if she raised any more concerns about his hostile treatment) "it will not be tolerated." After the meeting was over and Mr. Connor and

Ms. Bhagwandin left the room, Ms. Pickett immediately said, in a somber tone, that she felt sorry for Ms. Witherspoon.

45.     In July 2018, after the IP meeting, Mr. Connor went to SocGen and had a 30-minute conversation with Ms. Witherspoon's project manager, Mr. DeGiulio, about the incident. Mr. Connor misrepresented the facts and attacked her character; including falsely stating that Ms. Witherspoon went "ballistic" during the meeting and was "hysterical."  In doing so, Mr. Connor damaged Ms. Witherspoon's professional reputation and relationships with her colleagues in management positions; Mr. DeGiulio (a senior manager), and David Gallet ("Mr. Gallet") (an associate partner, and the relationship and co-project manager at SocGen). Upon information and belief, Mr. Connor has not similarly maligned white male consultants.

46.     Mr. Connor soon after disparaged Ms. Witherspoon to Nicolas Becquet ("Mr. Becquet") (project manager for Scotia's KYC Remediation and KYC Refresh projects, from 2016 – April 2021), who was not even working with Ms. Witherspoon at the time. Mr. Connor told Mr. Becquet that Ms. Witherspoon was "very upset" about not being promoted, when promotion was not a topic of conversation between herself and Mr. Connor at that time.

47.     From July 2018 through the first week of October 2018, on two or three occasions, Mr. Connor tried to coerce Ms. Witherspoon to apologize to him for defending herself when he falsely characterized her work during the IP incident.  In fact, Mr. Connor was so consumed with this incident and his hostility towards Ms. Witherspoon that he actually insisted that Ms. Witherspoon's project manager at the time, Mr. DeGiulio, compel her to apologize.   Upon information and belief, Mr. Connor has not similarly treated white male consultants.

48.     Sia admitted multiple times in its answer to the Commission that Mr. Connor was not Ms. Witherspoon's manager. Sia did not address why Mr. Connor intentionally created

repeated opportunities to berate and harass Ms. Witherspoon if he was not her manager and, therefore, there were no legitimate business reasons for these interactions. When the CEO goes out of his way to intimidate and undermine a junior employee whom he admittedly did and does not manage, for no apparent reason, that is powerful evidence of a hostile work environment

### D.    Adverse Employment Actions as to Appraisal and Promotions

49.    Despite the fact that Ms. Witherspoon performed tasks that required substantially equal or greater skill, effort, and responsibility, and has performed as well as or better than her peers and colleagues, she has received lower appraisal grades and delayed promotions, which is the result of Mr. Connor's discrimination and retaliation.

50.    Ms. Witherspoon's initial role on Scotia's KYC Remediation project began in May 2017 and involved heading up the enhanced due diligence ("EDD") workstream. Based on her success on the EDD stream, in July 2017, Ms. Witherspoon volunteered and was selected to lead her own workstream, transaction reviews. This workstream required the most AML subject matter expertise out of all of the various workstreams on the project.

### 1.    *Biased 2017 Appraisal Grade*

51.    Notwithstanding her strong performance in 2017, Ms. Witherspoon received a low appraisal grade, which reflected Mr. Connor's discriminatory bias and not her true work performance. This appraisal was belied by Ms. Witherspoon's strong contributions at Scotia and internally at Sia, the positive feedback she received from her managers throughout the year, and the feedback she received from the Scotia stakeholders. Mr. Connor intentionally undermined her work performance and gave her invalid or unwarranted criticism, which he then used as pretext to instruct Julia White ("Ms. White"), who was Ms. Witherspoon's 2017 year-end appraiser, and Mr. Becquet to assign Ms. Witherspoon a 'C' grade on 2017 year-end appraisal.

18

52.     Under Sia's evaluation scoring scale, a 'C' indicates that an employee's "expected performance has been perfectly delivered comparing to the targets," and a "B" means that his or her "expected performance has been perfectly delivered comparing to the objectives, but it is also beyond the expectations of the client." Sia's evaluation scale also states that "the performance evaluation is always to be carried out taking into account the level of difficulty of the mission," and that a person who is on a mission that is considered easy should have higher involvement in other activities (*e.g.,* attending working groups or writing IPs for Sia).

53.     The pretextual and biased nature of the 'C' grade assigned to Ms. Witherspoon is apparent from the review itself.  The review included no negative comments about the quality or delivery of Ms. Witherspoon's work. In addition, Ms. White said in her appraisal remarks that she and Ms. Witherspoon always worked well together, that she always did what she asked in a timely manner, and that she completed her work "with efficiency."

54.     By contrast, the negative comments in this appraisal reflect Mr. Connor's biases, including his conception of Ms. Witherspoon as a "sassy Black woman."  In this review, he falsely denigrated Ms. Witherspoon for failing to take feedback well.  As discussed above, Mr. Connor had a penchant for falsely accusing Ms. Witherspoon of arguing with him, and he reacted abusively when Ms. Witherspoon inquired about his false characterization of her work product.  It is telling that no one other than Mr. Connor has ever noted Ms. Witherspoon's ability to take feedback well in her four-year tenure with Sia.  In fact, Ms. White noted in Ms. Witherspoon's appraisal that she "received these points of improvement incredibly well." Though Mr. Becquet did not conduct this appraisal, Ms. Witherspoon still met with him to hear his thoughts since he was her project manager. During that meeting, Mr. Becquet told Ms. Witherspoon that it was a shame that she received a 'C' grade given her strong performance since she had been hired.

19

55.     Mr. Connor also insisted that Ms. Witherspoon be marked down for late arrivals, even though he was aware they were due to medical appointments and recovery related to her recent medical leave. When Ms. Witherspoon returned from medical leave, her team was working long hours to complete a deadline.  The intense workflow motivated Ms. Witherspoon to schedule follow-up appointments in the mornings, resulting in a couple of late arrivals, which were acceptable to her project manager, who repeatedly told the team that he did not care when they arrived as long as they put in the required hours in the day.  Ms. Witherspoon did that and more during this period.  Even though Ms. Witherspoon more than compensated by working late to help the team meet its deadline, Mr. Connor seized on her arriving at 10:00 a.m. on a couple of occasions to harass Ms. Witherspoon.  Each morning, Mr. Connor would ask Ms. Witherspoon's colleagues to track her arrival times, which he did not do for anybody else.

56.     Ms. Witherspoon's 'C' performance review cannot be reconciled with her work history or Sia's appraisal rubric.  Ms. Witherspoon was trusted with a continuous stream of challenging and important client-facing assignments that drew extensively upon her subject matter expertise, qualifications, and credentials. She would not have received these increasingly difficult and important assignments for Sia's major clients had her performance been average, let alone substandard, if she did not take feedback well, or if she did not have the absolute confidence of Sia's clients.

57.     Ms. Witherspoon's white male co-workers were not subjected to artificially deflated performance appraisals.

2.     *Passed up for Promotion in June 2018*

58.     In June 2018, six months after receiving a biased performance grade at the end of 2017, Ms. Witherspoon was passed up for promotion in favor of Mr. Davidson and a White female

colleague Alexandra Trombitas ("Ms. Trombitas") whose performance benchmarks and credentials were notably lower than Ms. Witherspoon's. From April 2016 to April 2017, Ms. Trombitas was in an administrative/support staff role (talent acquisition) at Sia before she was converted to a consultant, per her request. Ms. Trombitas had no prior consulting, regulatory or financial services experience, nor does she have an advanced degree or any professional licenses or certifications. For these reasons, Ms. Trombitas was given the most administrative role on Scotia's KYC Remediation project; uploading documents into Fenergo, Scotia's customer database, and she was billed out to the client at the lowest rate.  Unlike Ms. Witherspoon, Ms. Trombitas was never put in charge of any workflows within the project, was never put into any roles that required industry or subject-matter expertise and was never in a client-facing role. In addition, unlike Ms. Witherspoon, Ms. Trombitas did not contribute to working groups (by writing IPs, delivering industry news, discussing strategy for future business or current client engagements, etc.) or contribute to internal development in any other significant way. Moreover, unlike Ms. Witherspoon, Ms. Trombitas did not identify or initiate any additional business development or expansion opportunities.

59.     By contrast, Ms. Witherspoon took on a huge initiative at Scotia when she started the transaction review work-stream, which Ms. White noted in her 2017 year-end appraisal, stating "Brittney helped kick off the Transaction Review work-stream, including writing policies and procedures, creating templates and training a new hire. As this was a very difficult initiative by the client, Brittney handled it well."  Remarkably, Sia's answer to the Commission justified Ms. Trombitas' promotion by citing the fact that, at the request of her superiors, Ms. Trombitas gave a couple of trainings on the administrative task of uploading documents into Scotia's customer database, and because she received "positive feedback" from the client (which Ms. Witherspoon

also received). "Positive feedback" is not considered going above and beyond to warrant a promotion, as client satisfaction is Sia's expectation for every employee, and is a baseline condition for employment.

60.     Mr. Davidson, for his part, also received a 'C' for his 2017 year-end appraisal grade; however, unlike Ms. Witherspoon, Mr. Davidson was promoted in June 2018, despite this performance score.

61.     Ms. Witherspoon raised this allegation to the Commission, and Sia did not deny it. In fact, Sia admitted to the Commission that Ms. Witherspoon's 'C' grade resulted in her not being promoted in June 2018. Sia's answer, however, did not provide any explanation why Mr. Davidson's 'C' appraisal grade did not prevent him from being promoted like Sia said it did for Ms. Witherspoon.

62.     Ms. Witherspoon had the support of her SocGen project managers Mr. DeGiulio, and Mr. Gallet who praised Ms. Witherspoon, in front of Mr. Connor, in May 2018, a couple weeks before the management meeting to discuss June promotions, for her great work and business development initiatives at SocGen. Additionally, in May 2018, Ms. Witherspoon reached out to Mr. Becquet to see if he also would support her promotion, since he was her project manager at Scotia from May 2017 – March 2018. In a phone call, Mr. Becquet said he would support her being promoted.

63.     Ms. Witherspoon was not promoted until December 2018, and as a result she lost out on promotional pay for half of the year and was set back in her advancement within Sia.

3.     *Passed up for Promotion in June 2020*

64.     In June 2020, Ms. Witherspoon was again passed up for a promotion for discriminatory and retaliatory reasons.  Instead of recognizing Ms. Witherspoon's contributions,

Sia promoted a White man, Brian Ditoto ("Mr. Ditoto") even though Ms. Witherspoon was objectively equally or more qualified.  Mr. Ditoto was also promoted over another Black woman, Kathryna Pitt ("Ms. Pitt"), who was also equally or more qualified than him. Ms. Witherspoon and Ms. Pitt had been in the same title for the same length of time as him; received high-praise from and were appointed as team leads for the quality control team by their primary Scotia stakeholder, Jessie Lopez; and had daily roles and responsibilities that required a higher composite of AML/KYC expertise, skill, and effort. In addition to their daily responsibilities, Ms. Witherspoon and Ms. Pitt created and led a business development initiative (Scotia's Quality Control Enhancement Program and Scorecard), which added material value to the client's business operations and to Sia's marketability. Ms. Witherspoon also had significant internal involvement by initiating a study group for Sia employees to get CAMS certified and by being on the philanthropy team.  Comparatively, Mr. Ditoto was not serving in an official managerial role (at the time, he was acting in a supporting role for those officially managing the refresh workstream), he did not have any material internal involvement with Sia, and he did not start and/or lead any marketable business development initiatives. The disparate treatment was the direct cause of Ms. Pitt resigning from Sia, in August 2020.

> ### E.    Adverse Employment Action as to Compensation

65.    Though Ms. Witherspoon was eventually promoted and has received salary increases, the amount and/or percentage of her increases has been materially lower than male comparators. Ms. Witherspoon's salary is now $20,000-$50,000 less than her peers and colleagues, and her salary is increasing at a much slower rate.

> #### 1.    Lower 2017 bonus

66.    Historically, bonus amounts were decided solely by Mr. Connor. Sia's

"discretionary" bonus system is a facially-neutral practice that results in discriminatory impact upon Black women, including Ms. Witherspoon. Mr. Connor's decisions with respect to Ms. Witherspoon are not job-related and lack legitimate business considerations.

67.     Even though Ms. Witherspoon was billed at higher rates than some of her colleagues (notably Ms. Trombitas) and made significant client-facing contributions in 2017, she received one of the lowest bonuses on her team.  By comparison, her male colleagues on the project, Zachary Brulinski ("Mr. Brulinski"), Mr. Davidson, Mr. Pradere, Jonathan Gold ("Mr. Gold"), and other men, who performed substantially equivalent work under similar working conditions, received higher bonuses.  This disparity was caused by Mr. Connor's discrimination against Ms. Witherspoon.

### 2.     Lower Promotion Increase and Lower Bonus in December 2018

68.     At the end of December, Sia gives employees a cost-of-living salary increase, regardless of promotion or merit, which is typically between $3,000 - $8,000. In addition, employees who are promoted in June of the same year receive a separate salary increase due to their promotion. Historically, Ms. Witherspoon's colleagues received a salary increase of approximately $10,000 for their promotions in June to senior consultant or supervising senior consultant, bringing the total amount of their annual base salary increases to about $13,000-$18,000 (for example, the total amount of Mr. Davidson's and Ms. Trombitas' base salary increase for 2018 was roughly $16,000).

69.     Even when Ms. Witherspoon was ultimately promoted to the title of senior consultant in December 2018, she continued to suffer discrimination. At that time, she received a salary increase totaling $8,000, which covered both her promotion and her cost-of-living adjustment and was roughly half of the increases that Mr. Davidson and Ms. Trombitas received

in the year 2018.

70.     In addition, Ms. Witherspoon's bonus was lower than male peers and colleagues. For example, in 2018, Mr. Davidson, Mr. Ozimko, and Mr. Brulinski received approximately $8,000 in bonuses. By comparison, Ms. Witherspoon's 2018 bonus was only $6,000; even though she had similar responsibilities and roles and generated equal revenue as the men.   This discrepancy reflects Mr. Connor's discrimination against Ms. Witherspoon, along with Sia's pattern of giving women lower bonuses than men.

### 3.    *Denied Salary Increase in January 2019*

71.     After Mr. Gallet informed Ms. Witherspoon of her total salary increase at the end of 2018, she sent an email to Mr. Connor, Ms. Bhagwandin, and Mr. Gallet requesting a meeting to discuss why her compensation was materially less than her peers and colleagues and to request that her salary be adjusted. A meeting was subsequently scheduled for January 16, 2019.

72.     Without Ms. Witherspoon's knowledge, Mr. Connor invited Mr. Becquet to this meeting, which immediately set a tone of intimidation. During the meeting, Mr. Connor laid a series of shifting justifications for the compensation differentials; for example: salaries are based on prior consulting experience; salary increases are based on a person's level of involvement internally and on projects at the time of the request; Ms. Witherspoon received a 'C' for her 2017 appraisal (which was due to Mr. Connor's discrimination); and increases are given to "bring others up-to-level" with the salaries of their "peers" (whom, in Sia's assessment, are only those with the same title, not those with similar roles and responsibilities, and professional profiles) who make more money, regardless of their credentials.   These reasons are each pretext for discrimination.

73.     In response to Ms. Witherspoon's complaints of discrimination in compensation, Mr. Connor and Mr. Becquet notified Mr. Davidson and Ms. Trombitas about the meeting, falsely

conveyed to them that Ms. Witherspoon believed they were undeserving of their salaries, and told

them that they should not reveal their salaries to her. Ms. Witherspoon raised this allegation with

the Commission, and Sia did not offer any legitimate reason for disclosing her compensation

meeting to Mr. Davidson and Ms. Trombitas, let alone its false characterization of her comments.

### 4.     Sia's Documentation to the Commission Confirms Pay Inequity

74.     In April 2020, Sia's answer to the Commission asserted that Ms. Witherspoon's

salary was comparable to the salaries of a gerrymandered roster of supposed "peers." To support

its claim, Sia submitted a document that compared the average compensation of certain employees

who bear little resemblance to Ms. Witherspoon, from January 2017 to the start of January 2019.

Sia's list excluded Ms. Witherspoon's true peers and comparators.

75.     Sia's list also failed to control for factors such as differences in educational

attainment, professional licenses and certifications, years of relevant work experience, or the

difficulty and extent of the role and responsibilities on client assignments and internally at Sia.

Sia's list does not support the pretextual justifications Mr. Connor gave during Ms. Witherspoon's

compensation meeting.  The only common factor linking the individuals listed is that they had the

same title in 2017 (Consultant), except for Mr. Pankov who was Sia's IT officer (which is an

internal support role), and Nicole Minassian, who was Sia's intern from June – August 2017.

76.     This gerrymandered analysis still cannot hide the discriminatory practices that are

prevalent at Sia.  The closest peer or comparator to Ms. Witherspoon on Sia's list, Stephen Perez

("Mr. Perez") (a White man), received a combined promotion and cost-of-living increase of

$17,500 in December 2018, while Ms. Witherspoon's combined promotion and cost-of-living

increases totaled only $8,000. There were no legitimate business reasons to explain the pay

inequity, as Ms. Witherspoon and Mr. Perez were both promoted to the same title, both located in

the same city (New York), Ms. Witherspoon generated more revenue in 2018 than Mr. Perez, she had the same 2018 appraisal grade as Mr. Perez, she had been at Sia longer than Mr. Perez, she had equal years of prior work experience as Mr. Perez, she had comparable roles and responsibilities on client projects as Mr. Perez, she had the same or more internal involvement at Sia than Mr. Perez, and she had an advanced degree and professional licenses and certification which Mr. Perez did not possess. As of January 1, 2019, Mr. Perez's salary was $110,000, whereas Ms. Witherspoon's was $93,750. It is notable that $110,000 is the salary that Ms. Witherspoon requested (and justified) to Mr. Connor, who rejected it (and refused to adjust her salary, even to an amount lower than requested) without a legitimate basis during the January 16, 2019 meeting.

77.     Sia's list also reveals a broader pattern of discrimination between male and female employees at Sia. From 2017 to January 2019, the average salary increase among all women on the list who were hired in 2017 was $8,875. During this same time period, the average salary increase among all men on the list who were hired in 2017 was $12,429. From January 2017 to January 2019, of those hired in 2017, the salaries of all women (regardless of promotion) increased by an average of 9.8%, the salaries of the women promoted increased by an average of 9.3%, the salaries for men promoted increased by an average of 18.4%, and the salaries for men who were not promoted increased by an average of 12.4%. All of the women promoted, but receiving lower salary increases, are women of color or over the age of 40 and, on average, had more years of work experience (specifically in financial services), were the only group with advanced degrees and certifications/licenses, and generated more revenue. The fact that male consultants (even those who were not promoted between January 2017 and January 2019), nonetheless, received higher average salary increases is strong evidence of sex-based discrimination.

        *5. Other examples of pay disparity*

78.     Sia has even applied different rules in connection with overtime pay to Ms. Witherspoon's detriment. Between December 2018 - April 2019, Mr. Davidson was paid overtime after forty hours of work in a week, based on a prorated base salary rate. Ms. Witherspoon also work overtime during this time-period, at the client's request, but she (along with several female contractors) was never compensated for their additional work.

79.     Moreover, Sia awarded a Personal Service Bonus ("PSB") to three men, Mr. Davidson, Maxim Baillet ("Mr. Baillet"), and Mr. Brulinski, in 2020 and 2021 for their roles at Scotia. PSB's are based upon one's managerial role on a project that is key to the project's success, or one's success in originating business.  Ms. Witherspoon has been treated as a manager and has joined management team calls since 2020, she is the only person on her team with relevant AML credentials, and her role was critical to ensuring that Sia's work product for the client aligns with regulatory standards. Ms. Witherspoon was responsible for training and improving the quality of her team's work and presenting new service offerings to the client.  Sia's failure to award her a PSB is an additional example of pay disparity and discrimination because of race and sex.

## F.     Retaliation for Opposing Discrimination

80.     After raising separate concerns that she had been discriminated against because of her race and sex, Ms. Witherspoon also experienced retaliation.  These incidents occurred after Ms. Witherspoon attempted to seek redress for the discrimination and discriminatory harassment she had suffered at Sia. The retaliation began immediately following Ms. Witherspoon's attempt to contest her inequitable compensation and it intensified after she filed an official complaint with ADP in August 2019.

### 1.     *Ms. Witherspoon Reprimanded for Using Allotted Sick Days*

81.     Immediately following the meeting in January 2019, in addition to being falsely

disparaged to her colleagues, as detailed above, Ms. Witherspoon was unfairly reprimanded for taking her allotted sick days when she was ill.  This began a pattern of bullying that persisted during her ensuing tenure at Sia. When Ms. Witherspoon returned to work after three days of being out sick in January 2019, Mr. Becquet ordered her into the storage room at Scotia and proceeded to interrogate her about the sick days. Mr. Becquet said that Mr. Connor and Ms. Bhagwandin were upset with Ms. Witherspoon because she took sick days, tried to coerce Ms. Witherspoon into falsely admitting that she was not really sick, then said that even if she really was sick, she still should have come to work and sat at her desk.

82.    Ms. Witherspoon had never been reprimanded for using her allotted sick days prior to her compensation meeting. This interrogation was for the sole purpose of bullying and intimidating Ms. Witherspoon in retaliation for raising concerns about pay inequity based upon race and sex, no legitimate or work-related explanation for the hostility were offered. Sia's own Employee Policy in effect at the time stated: "Employees have the right to request and use sick time and may file a complaint for alleged violations of this policy with the New York City Department of Consumer Affairs."

### 2. *Prevented from Participating in Professional Development*

83.    Ms. Witherspoon also was unfairly denied the ability to attend the Association of Certified Anti-Money Laundering Specialists ("ACAMS") conference in retaliation for raising concerns about her compensation. On June 10, 2019, five months after the January compensation meeting, Ms. Witherspoon reached out to Christopher Pearson ("Mr. Pearson") (an associate partner and the person in charge of conference coordination) about attending ACAMS' upcoming AML Risk Conference, which would have been the first time she attended a conference during her tenure at Sia. ACAMS is the largest international membership organization in the area of anti-

money laundering, terrorist financing, and financial crime detection and prevention. Given that Ms. Witherspoon was staffed on an AML-related project, which requires industry knowledge and skill, attending the ACAMS conference was important to her professional development and would have added value to Sia.

84.     At the time of Ms. Witherspoon's request, only one person was slated to attend the conference, Fiona Germain, and Mr. Pearson said that no one else from Sia had asked to go. Mr. Pearson subsequently emailed Ms. Pitt on June 12, 2019 (two days after Ms. Witherspoon's request) and asked her if she wanted to attend the ACAMS conference. Ms. Pitt forwarded Mr. Pearson's email to Ms. Witherspoon because she was confused about why she was being asked to go to a conference that Ms. Witherspoon had previously expressed interest in attending.  When Ms. Witherspoon followed up, Mr. Pearson falsely asserted that Ms. Pitt was asked to attend the conference before Ms. Witherspoon expressed her interest and thus, Ms. Witherspoon would not be able to attend.  Ms. Pitt confirmed that this was untrue. When confronted about this deception, Mr. Pearson offered further pre-textual justifications, including that Ms. Pitt is CAMS certified, which applies equally to Ms. Witherspoon, before finally admitting that Mr. Connor did not want Ms. Witherspoon to attend the conference. Mr. Connor's purported reason – Ms. Witherspoon supposedly deficient working group attendance – was also pretextual.  Indeed, Ms. Pitt never attended a single working group during her entire tenure at Sia, which Mr. Connor was aware of since Ms. Pitt was assigned to his working group, while Ms. Witherspoon had attended the majority of working groups during her tenure at Sia.

85.     When Ms. Witherspoon asked Mr. Pearson for the real reason she was not allowed to attend the conference, because the working group attendance was clearly a pretext, he went silent and could not answer the question. This pattern of deception and pretext demonstrates that

Ms. Witherspoon was deprived of this professional development opportunity to retaliate against her for opposing the discriminatory treatment she had suffered.

### 3. *Lower 2019 Bonus*

86.    Ms. Witherspoon filed a formal complaint against Mr. Connor with ADP TotalSource, Sia's professional employer organization, on August 11, 2019.  Mr. Connor subsequently retaliated against her by giving her a lower-than-merited bonus in 2019.  The 2019 bonus was lower than the bonus Ms. Witherspoon had received in 2018, even though she received the same performance grade of "B" in both years, and it was lower than the bonus awarded to her male peers and colleagues, including Mr. Davidson, Mr. Brulinski, and Mr. Baillet, who all shared the same title as her for all of 2019, with whom she generated a comparable amount of revenue, and/or with whom she shared equivalent roles and responsibilities. Sia's proffered reason to the Commission for awarding Ms. Witherspoon a lower bonus in 2019 than 2018 was that the bonus pool was lower, company-wide. Assuming, *arguendo*, that the 2019 bonus pool was lower, Sia's rationale does not explain why the bonus amounts from this pool were disproportionately distributed to men who shared Ms. Witherspoon's title.

### 4. *Blocked from other Job Benefits*

87.    Mr. Connor and Mr. Becquet further retaliated against Ms. Witherspoon by revoking her remote working privileges. In May 2019, Ms. Witherspoon worked remotely for two weeks when her mother was diagnosed with congestive heart failure, and she returned home to Washington State to be with her. When Ms. Witherspoon asked to work remotely in December 2019, Mr. Becquet replied that she would not be permitted to use vacation time and work remotely back-to-back, based on the pretext that such remote work would be "unfair" to the team, going forward.

88.    Ms. Witherspoon's treatment with respect to remote work stands in stark contrast to the more permissive treatment of her colleagues.  Since January 2018, Mr. Becquet and Mr. Connor have allowed several members on Ms. Witherspoon's project to work remotely indefinitely or for years on end. Mr. Brulinski worked remotely from Brazil from January 2018 – March/April 2019.  Ms. White permanently moved to Florida in the summer of 2018 and works remotely from there.  Mr. Becquet worked remotely from June – September 2019.  Ms. Pitt moved to Kentucky in November 2019 and worked remotely form there until she resigned.  Steven Begiac moved back to France in August 2019 and worked remotely until January 2020. The comparatively poor treatment of Ms. Witherspoon is evidence of retaliation. Sia's answer to the Commission did not explain why Ms. Witherspoon working remotely for a week or two would be "unfair" to the team, given that many members on her team have been allowed to work remotely for months, years, and indefinitely (including at the time of this incident).

89.    This retaliatory treatment took place shortly after Ms. Witherspoon filed her complaint with ADP against Mr. Connor in August 2019 and spoke with the person investigating the complaint in November 2019.

### 5.    Lower 2020 Promotion and Cost-of-Living Increase and Failure to Award Personal Service Bonus

90.    When Ms. Witherspoon was promoted to supervising senior consultant in December 2020, the discriminatory and retaliatory treatment she suffered persisted.  Sia combined Ms. Witherspoon's promotion increase and cost-of-living increase into one amount, instead of awarding two separate increases as Sia does for the employees who are promoted in June. That resulted in her overall compensation package being materially lower than Mr. Brulinski, Mr. Baillet, and Mr. Davidson.  In addition, even though she had been promoted, the salary increases she received were decreasing, and she was not awarded a Personal Service Bonus despite her equal

qualifications for such a bonus as compared to the three males who received it. This is further evidence of discrimination and retaliation by Mr. Connor, which intensified after the January 2019 compensation meeting and the filing of her formal complaint in August 2019.

      6.   *Threatened with Disciplinary Action for Raising Concerns About Mr. Connor's Harassment, Discrimination, and Retaliation*

91.     On April 1, 2021, Ms. Witherspoon and Jennifer Green ("Ms. Green"), jointly, sent an email to members of human resources, associate partners and partners in Sia and Sia Partners to raise concerns about Mr. Connor's harassment, discrimination, and retaliatory behavior towards them. As a result of their opposition to discrimination and retaliation, on June 4, 2021, Shari Sparling ("Ms. Sparling"), who took over as director of HR, in September 2020, after Ms. Bhagwandin resigned, sent Ms. Witherspoon an email reprimanding her for having raised concerns on April 1, 2021. Ms. Sparling falsely claimed that Ms. Witherspoon's message to leadership about her mistreatment was not in compliance with policy, and she falsely accused Ms. Witherspoon of intentionally sending her message on the day of Sia's business update. In fact, Sia changed the date of its business update, after Ms. Witherspoon and Ms. Green had already decided to send the email on April 1, 2021. Ms. Sparling threatened Ms. Witherspoon with disciplinary action if she does not use Sia's "problem resolution" process outlined in its Employee Handbook going forward. The reprimand and threats Ms. Sparling made on behalf of Sia and Mr. Connor were intended to, and would reasonably be expected to, intimidate and dissuade Ms. Witherspoon from reporting any future abuse. Ms. Sparling's conduct on behalf of Sia and Mr. Connor was in retaliation for Ms. Witherspoon having notified associate partners and partners about Mr. Connor's abusive conduct.

92.     Sia Partners' Global Diversity, Equity, Inclusion and Belonging ("DEIB") Policy states: "This policy applies to all Sia Partners offices and employees worldwide." Regarding how

to raise concerns of discrimination and harassment, Sia Partners' Global DEIB Policy states: "While employees are encouraged to use the Grievance & Whistleblowing Procedure, they are at liberty to forego it."

93.     Moreover, on three separate occasions since April 1, 2021, Sia has pressed Ms. Witherspoon to participate in another investigation. It does not appear that Sia's belated investigation is in good faith. Rather, it appears to be an attempt to gain information to prepare a response to Ms. Witherspoon's complaint.

94.     Given that in 2019 Ms. Witherspoon used Sia's internal "problem resolution" process to complain about Mr. Connor's conduct, and Mr. Connor (with the help of HR) abused his power as CEO to undermine a good faith and timely investigation, she decided to forego this reporting method and escalate the matter to those in management positions outside of Sia, in hopes that there would be a more objective response. The failure of the prior investigation, which is described more fully below, is also the reason Ms. Witherspoon declined Sia's requests for her participation in yet another internal investigation.

95.     Sia's local policy (the Employee Handbook) does not trump Sia Partners' global policy (Sia Partners' Global DEIB Policy), and Sia forcing Ms. Witherspoon to use its local "problem resolution" process is not in compliance with Sia Partners' Global DEIB Policy. Sia is creating this artificial barrier to silence complaints against Mr. Connor, as Sia knows its "problem resolution" reporting process is ineffective.  This internal procedure has no system of checks and balances or independent review. Ms. Sparling, who reports directly into Mr. Connor, and Mr. Connor, the highest-ranking person in Sia, have sole internal control to adjudicate matters raised through this procedure.  This procedure does not involve any person in a senior-management role reviewing claims against Mr. Connor, and in any event all of senior-level management within Sia

34

U.S. reports into him.  In fact, no one in Sia U.S. has authority to invoke any consequences on Mr. Connor even if the adjudicator did find wrongdoing.

> **G.**     **Sia's Failure to Investigate Complaint of Discrimination and Retaliation**

96.      Sia failed to respond to Ms. Witherspoon's complaints, further demonstrating its willingness to countenance sex and race discrimination and retaliation.  After she complained to ADP TotalSource on August 11, 2019, Ms. Witherspoon was not interviewed until November 2019.  That her complaint languished for months without any response violated Sia's employee policy, which stated that management will timely respond to complaints and that employees will be notified of the decision made regarding their allegations.

97.      Sia's complaint procedure at the time stated:

SIA Partners US is committed to all employees. Part of this commitment is encouraging an open and frank atmosphere in which any problem, complaint, suggestion, or question *receives a timely response from the company's supervisors and management*. If a situation occurs when employees believe that a condition of employment or a decision affecting them is unjust or inequitable, they are encouraged to bring those issues to management's attention using the same procedure described [below] in the Harassment policy:

> Employee presents problem to immediate supervisor at SIA Partners US after incident occurs. If supervisor is unavailable or employee believes it would be inappropriate to contact that person, employee may present problem to any other member of management at SIA Partners US

> Supervisor at SIA Partners US responds to problem during discussion or after consulting with appropriate management, when necessary. Supervisor documents discussion.

> Employee contacts the HR department at SIA Partners US and ADP TotalSource Employee Service Center at 800-554-1802 if problem is unresolved.

> The HR Department of SIA Partners US and the ADP TotalSource Employee Service Center counsels and advises employee.

> Human Resources Department at SIA Partners US with the support of ADP TotalSource reviews and considers problem. *Human Resources Department at SIA Partners US informs employee of decision and forwards copy of*

*written response to employee's file.*

98.     Between August 2019 and November 2019, Ms. Witherspoon followed up multiple times with Liz Camacho ("Ms. Camacho"), the ADP TotalSource representative who was initially assigned to investigate her complaint. Ms. Camacho was generally unresponsive, giving superficial answers or saying that Mr. Connor was busy.  It was not until Ms. Witherspoon retained counsel to contact Ms. Camacho in October 2019 that action was taken. Approximately a week after Ms. Witherspoon's counsel called Ms. Camacho, Ms. Witherspoon was informed that Sia hired outside counsel to investigate her claim and that Margaret Watson ("Ms. Watson") of Littler Mendelson would be taking over as the investigator.

99.     Ms. Witherspoon first met with Ms. Watson on November 8, 2019, and she met with her a second time two weeks later. Ms. Witherspoon provided Ms. Watson the names of five individuals (Ms. Green; Cynthia O'Keefe; Mr. Davidson; Noel Connolly; and Mr. DeGiulio) who could corroborate her factual assertions. After the end of Ms. Witherspoon's second interview, Ms. Watson told her that she would conduct a timely investigation given that her complaint had been pending since August. That did not happen. Littler Mendelson never contacted or interviewed Mr. Connolly or Mr. DeGiulio, who both have firsthand knowledge of Mr. Connor calling Ms. Witherspoon a "sassy Black girl" during a meeting at SocGen.  Upon information and belief, the investigator did not interview Mr. Connor. Moreover, the investigator did not ask Ms. Witherspoon to provide any supporting evidence, such as emails, text messages or her end-of-year appraisals. It is not clear whether the investigator obtained any documents from Sia related to the investigation.

100.    .  Ms. Witherspoon raised this sham investigation in her complaint to the Commission, and Sia's response, tellingly, offered no explanation for its inability or unwillingness to timely investigate and respond to her complaint.

101.    In May 2021, Ms. Witherspoon was finally notified that the investigation was

concluded, apparently prompted by the fact that Ms. Witherspoon had notified Sia in April 2021 that she had received a Notice of Right to Sue from the EEOC and intend to file a complaint in this Court.

### H.    Sia's and Mr. Connor's Discriminatory Treatment of Other Women

#### 1.    *Black Women*

102.    Mr. Connor's treatment of Ms. Witherspoon is consistent with his pattern of mistreating Black women.  Sia has only directly hired eight Black women (Ms. Witherspoon, Ms. Pitt, Kimberly Smith, Fiona Germain, Naika Daudin, Precious Ackah, Lekisha Nicholas, and Ariel Govan). Of those eight women, at least seven have experienced harassment, disparate treatment, and/or retaliation.  This discrimination directly contributed to four of the eight Black women resigning from Sia, and another one being unjustly terminated. Moreover, four of the Black women left Sia within 3 - 12 months of being hired.

103.    Besides Ms. Witherspoon, no other Black woman that Sia has directly hired has ever been promoted, even though other Black women were and are eligible for promotions to various titles, particularly Ms. Pitt and (who resigned in August 2020) and Ariel Govan (who resigned in October 2020), who were both passed up for promotion in June 2020, in favor of a less qualified White man.

104.    Precious Ackah ("Ms. Ackah") was hired as an HR coordinator in Sia's New York office in November 2017. She was terminated in April 2018, two months after she reported to Ms. Bhagwandin and Mr. Connor about an employee making a comment that she found to be racially offensive. After her report, Ms. Ackah's job title was involuntarily changed from HR coordinator to marketing coordinator, even though Sia knew that she did not have a marketing background and did not hire her for a marketing role. Terminations and involuntary transfers are not common at Sia, and a similarly-situated White woman with a comparable role is still with Sia despite her

37

widely-known poor work performance.

105.    Naika Daudin ("Ms. Daudin") told Ms. Witherspoon in late 2019 that she was experiencing difficulties with Mr. Connor, and she resigned from Sia approximately six months later.

106.    Lekisha Nicholas ("Ms. Nicholas") was hired as a manager. Mr. Connor and Mr. Becquet treated Ms. Nicholas with open hostility and verbal attacks. As a result of this hostility, Ms. Nicholas resigned from Sia in November 2018, three months after being hired. Mr. Connor then called and maligned Ms. Nicholas to the recruiter who had recommended her.

107.    Fiona Germain ("Ms. Germain") complained to Sia management and HR in or around April or May 2019 that men on her project had invaded her privacy and hacked into her laptop. Ms. Germain was ultimately taken off the SocGen project in retaliation for her complaint. Ms. Germain has been at Sia for three years and has never been promoted.

108.    Kimberley Smith ("Ms. Smith") is an associate partner who was hired in Sia's Houston office in November 2019. In March 2020, four months after Ms. Smith's hire, Sia employees began working from home due to COVID-19. Sia typically has four in-office business update meetings per year. However, due to COVID-19, Sia has hosted monthly (and sometimes bi-monthly) virtual business updates, which started in April 2020. Except for Ms. Smith (the only Black female partner), all of the partners across all of Sia's U.S. offices have spoken on the virtual calls about business-related matters and other updates from their respective offices.  By contrast, Ms. Smith's role has been limited to addressing race-related issues.  This is the functional equivalent of introducing Ms. Witherspoon and Mr. Davidson as diversity hires. As of March 2021, Ms. Smith is no longer with Sia, which continues the trend of most Black women leaving Sia in 18 months or less.

109.     Ms. Pitt felt that she had been sexually harassed in September 2018 by two male contractors Sia hired for the KYC Remediation project at Scotia. Mr. Becquet (Ms. Pitt's project manager) was aware of this and failed to take corrective action, other than to task Mr. Davidson with revising the seating arrangement to move Ms. Pitt to a new office. This is typical of Sia's failure to address credible allegations of harassment by women.

110.     From administrative assistants to partners, Black women at all levels have experienced some form of bias or adverse treatment at Sia.

2.     *Non-Black Women*

111.     In addition to the Black women referenced above, Mr. Connor has a history of creating a hostile work environment for women generally, including but not limited to Rachel Miterko (nee Fair) ("Ms. Miterko"); Cynthia O'Keefe ("Ms. O'Keefe"); Ms. Green; Inna Babenko ("Ms. Babenko"); Ms. Pickett; Ms. Bhagwandin; Gabriela Podesta ("Ms. Podesta"); Svitlana Dudchak; Lia Vydria; Alanna Burton. He has often yelled at, intimidated, humiliated, and singled-out women without provocation or a job-related basis for his hostility. By comparison, Mr. Connor's criticism of men is objective and is usually directly related to workplace behavior or job performance. The women that Mr. Connor has bullied and/or harassed were doing well on client projects, billable for all or most of their tenures at Sia, and/or liked and respected by their peers and colleagues. Ms. Bhagwandin admitted that she was aware of the hostile work environment Mr. Connor created but that she felt powerless to stop him.

112.     Mr. Connor created a hostile work environment for Ms. Miterko and Ms. Bhagwandin after they returned to work from maternity leave. Ms. Miterko had her baby on October 9, 2018 and returned to work in 2019; and Ms. Bhagwandin had her baby in November 2019 and returned to work around March 2020. Mr. Connor made offensive, unwelcome, and false

comments about their recent childbirths and their purported poor work performance or lack of availability subsequent to becoming parents. Ms. Miterko and Ms. Bhagwandin resigned in June 2020 and September 2020, respectively.

113.    In or around February 3, 2020, Mr. Connor flew into a rage and began screaming at and berating Ms. Babenko loudly enough for others in the office to hear. Shortly after Mr. Connor's verbal attack, Ms. Babenko needed to go to the emergency room and required several days away from work to recover.

114.    Mr. Connor became infuriated when Ms. Podesta did not attend the optional North American seminar in March 2018 and when she declined to fly from her base in Houston, TX to New York to present herself to Mr. Connor and to meet colleagues in New York. Because Mr. Connor could not directly bully Ms. Podesta from afar, he pressured Noel Connolly ("Mr. Connolly") and Wayne Campbell ("Mr. Campbell") (both associate partners in Sia's Houston office during Ms. Podesta's tenure) to hassle and disparage her.

115.    Mr. Connolly reported that Ms. Podesta was an extremely successful professional who was respected by clients, was 100% billable, and was the best revenue generator in the Houston office. Despite this, Mr. Connor instructed Mr. Connolly several times to "write up" Ms. Podesta and generally create a hostile environment because, according to Mr. Connor, Ms. Podesta's decision not to attend the seminar showed that she was not a "team player." Mr. Connolly refused to do this, but Mr. Campbell was willing to follow Mr. Connor's directive. He undermined Ms. Podesta and interfered with her relationship with the client, created conflicts over insignificant and/or non-business-related matters, and gave her a lower appraisal grade. This led to Ms. Podesta resigning from Sia. Mr. Connor also gave Ms. Podesta a lower end-of-year bonus than she merited. Mr. Connolly reported that Ms. Podesta's bonus was 3-5 times lower than men in the Houston

office who were only billable 40%, far below the 100% Ms. Podesta achieved.

116.    Ms. Green received a lower starting salary because Mr. Connor factored in her prior salary history, perpetuating the gender pay gap. She was then billed out to clients as a Senior Consultant, while given the internal title of consultant, and was subjected to intense retaliatory attacks when she inquired about promotion with Mr. Connor. Forced to leave Mr. Connor's working group because of his mistreatment of her, Ms. Green was then punished with lower-than-merited appraisals. Her salary and title remain disparately low as compared to her male peers and colleagues.

117.    Finally, Mr. Connor expressed dislike for the way Janelle Jagnanan (Ms. Jagnanan") (a former senior consultant in the energy practice at Sia's Houston office) dressed and because he did not think she looked attractive. Mr. Connor said he wished he could put Ms. Jagnanan's brain inside the body of Hessed Honstein, a former model and a woman who Mr. Connor finds physically attractive, who is currently in an administrative role (talent acquisition) at Sia's Houston office.

118.    In its response to the Commission, Sia failed to respond to Ms. Witherspoon's detailed allegations that numerous other women have experienced the discriminatory and hostile work environment created by Sia and Mr. Connor and that this contributed to several women leaving Sia.

            *3.    Women Underrepresented at the Senior-Level*

119.    Prior to December 2020 (and not until after Ms. Witherspoon filed a complaint with the Commission in February 2020), no woman at Sia had been promoted to a senior-level position of senior manager, managing director, associate partner, or partner, even though there are women with measurable key performance indicators ("KPIs") to merit a promotion to a senior-level

position. When considering promoting someone to associate partner or partner, KPIs around business generating are the primary consideration. Partners have said during business update calls (including as recently as September 2020) that, to be promoted to partner, a person needs to have "a book of business." Even though there are women who have satisfied these objective criteria, they have not been promoted. This reflects Mr. Connor's deeply entrenched bias against women.

120.     Ms. Pickett, for example, has originated more business (and/or has been an integral part of closing deals) than all or virtually all of the male partners (excluding those from the acquisitions). She has decades of relevant work experience, has many contacts within the financial services industry, is Sia's AML subject matter expert, has extensive internal involvement with Sia's compliance working group, and has worked for Sia U.S. since 2013. Despite this, Ms. Pickett still has not been promoted to associate partner, managing only to rise to the level of managing director in December 2020. By comparison, Mr. Pearson was promoted to associate partner in December 2018, even though his originations were inferior to Ms. Pickett's, and he suffered from bad reviews due to business conduct and poor treatment of personnel.

### I.     Sia and Sia Partners' Failure to Take Corrective Action

#### 1.     *Lack of Accountability*

121.     In response to the complaint Ms. Witherspoon filed with the Commission in February 2020, Sia rolled out certain superficial diversity and inclusion initiatives in or around May 2020. These initiatives are only intended to make Sia and Mr. Connor appear proactive and culturally vigilant to cover up Mr. Connor's abuse and Sia's toxic environment. Sia has not acknowledged its systemic issues with harassment of women or pay and promotion inequity. Nor has Sia stated its plan to remediate these issues, including providing transparency about its pay policies and practices. To date, no attempt has been made to hold Mr. Connor accountable.

122.    Sia's diversity and inclusion initiative includes partnering with Historically Black Colleges and Universities, and organizations like Year Up, and Women's Bond Club, to recruit more "diverse candidates." Mr. Connor cannot effectively promote Sia's diversity and gender equality initiatives when he does not practice those values himself. For years, Mr. Connor has used his power as CEO to go on smear campaigns and engage in other manipulative tactics to diminish allegations, blame women and make excuses for his abuse, deny wrongdoing, refuse to listen and change his behavior, control and undermine the neutrality of HR and investigations, and evade accountability.  If Sia and Sia Partners were truly committed to diversity and equality, it would address concerns of harassment and gender and racial inequity that its current employees face, before recruiting "diverse candidates." If Sia and Sia Partners will not make the necessary changes to ensure that its employees are in a safe work environment, new recruits will also be subjected to a company culture of hostility, indifference, and inequity and will be at risk of experiencing similar abuse from Mr. Connor and other Sia management.

123.    Mr. Courtecuisse has known for years about reports of unethical behavior and discriminatory harassment by Mr. Connor. Shortly after Mr. Connor verbally attacked an employee from Sia Partners' Montreal office during the North American seminar in May 2017, Mr. Courtecuisse demoted him from CEO of Sia North America (which comprised the U.S. and Canada) to CEO of Sia U.S.  Upon information and belief, Mr. Courtecuisse has seen numerous online reviews (for example, Glassdoor and Vault) from previous and current employees, spanning from 2014 – 2021, which express concerns about Mr. Connor's hostility, bias against women, racial bias, and reports of pay discrimination against employees requiring a work visa. Since 2018, Sia and Sia Partners has more than once asked employees to complete surveys and questionnaires about their experiences at Sia. In addition, upon information and belief, employees have directly

43

told Mr. Courtecuisse about the hostile work environment Mr. Connor has created in the U.S. (for example, King Bouloud, a former manager from Sia Partners' Paris office, who discussed concerns after spending time in Sia's New York office). Mr. Courtecuisse has ignored these concerns and focused instead on Sia's U.S. revenue. Meeting revenue targets does not exempt Mr. Connor from the law or Sia's policies regarding harassment and investigations.

124.    Sia and Mr. Courtecuisse failed to properly investigate claims against Mr. Connor or implement controls to protect Ms. Witherspoon and others from further harm from Mr. Connor. Sia and Mr. Courtecuisse have taken no material disciplinary action against Mr. Connor for violating Sia's U.S. anti-harassment policy, including using his power as CEO to interfere with a fair and timely investigation of the claims against him.

125.    Mr. Connor's consistent harassment and discrimination against women, and his violations of Sia policy without consequence, sends a message that such conduct is tolerated at Sia. Until Sia and Mr. Courtecuisse hold Mr. Connor accountable for his actions against Ms. Witherspoon and other women, it can only be concluded that Sia's diversity initiatives are not calculated to change its toxic work environment. Instead, these initiatives are a sham intended to protect Sia's image and conceal and deflect from legitimate concerns about harassment and discrimination.

### 2.    Lack of Training to Avoid Biased Subjective Decision-Making

126.    Mr. Connor has led by example and set the tone for hostility and retaliation, which has permeated Sia. As of February 2021, no one has received training concerning racial harassment or anti-retaliation training. As a result, managers offer reckless advice that could result in an employee facing additional harm. For example, on December 18, 2020, Mr. Becquet (who was promoted to managing director in December 2020) called to inform Ms. Witherspoon that she was

being promoted and about her compensation increase. During this call, and without prompting, Mr. Becquet said that he knows that Ms. Witherspoon does not want to go to the compliance working group because she is trying to avoid Mr. Connor, but that she should go anyway. For Mr. Becquet to suggest that Ms. Witherspoon put herself back in harm's way, despite knowing that she filed an internal complaint against Mr. Connor for harassment and is afraid of further abuse from him, shows a complete lack of regard for the law or employee safety.

127.    Sia has not provided any training for project managers and other appraisers on how to conduct objective appraisals. Appraisals are heavily influenced by implicit bias, inconsistent standards, and are not supported by facts and measurable data.

<b><u>DAMAGES</u></b>

128.    As a result of Defendants' unlawful conduct, Ms. Witherspoon has suffered extensive economic and non-economic damages.

**A.    Emotional Distress and Anxiety**

129.    Ms. Witherspoon suffers from claustrophobia. Being confined in a small space or feeling that she cannot get out of a small space, causes Ms. Witherspoon to panic and feel short of breath. Sia was on notice of this condition because Ms. Witherspoon informed Ms. Bhagwandin about it after she was stuck in Sia's office elevator on March 13, 2017. In addition, in September 2017, Ms. Bhagwandin informed Ms. White (Ms. Witherspoon's appraiser and de facto co-project manager of the Scotia engagement) that Ms. Witherspoon is claustrophobic.

130.    When Mr. Connor blocked the entrance of a small phone booth while yelling at Ms. Witherspoon about finding Mr. Ozimko's replacement for the optional presentation skills training, Ms. Witherspoon could not have exited the phone booth without physically pushing Mr. Connor aside or obtaining his permission to be let out. The extreme power imbalance between them led

her to believe that choosing either option would have escalated the situation and could have resulted in her discharge. For most women, it would be troubling for a male superior to block them inside a phone booth, bring his hand close to her face, and yell. That experience was heightened by Ms. Witherspoon's claustrophobia, and it remains a searing and scarring trauma for her. Since that incident, Ms. Witherspoon has been afraid of being alone with Mr. Connor.

131.    As a result of Mr. Connor's hostile conduct, Ms. Witherspoon often feels anxious or afraid to speak for fear that she will be accused of arguing, will be yelled at, or will otherwise be humiliated in front of her colleagues. Communicating effectively with clients is paramount in the consulting industry. Mr. Connor's mistreatment has impacted Ms. Witherspoon's professional development and caused her severe anxiety when speaking.

132.    Mr. Connor's hostility has also made Ms. Witherspoon afraid to attend company events.  For example, she did not attend Sia's seminar in Mexico, in March 2019, because of the hostility and retaliation she experienced during and after her compensation meeting in January 2019.  Ms. Witherspoon also did not attend a black-tie gala hosted at The Metropolitan Museum of Art, in October 2019, to celebrate Sia Partners' 20th anniversary, in fear that Mr. Connor would create another hostile encounter due to her filing a formal complaint against him in August 2019, and his subsequent attempts to prevent a fair and timely investigation. Mr. Connor has used company events and meetings as an opportunity to shame Ms. Witherspoon, yell at and degrade her (alone and in front of others), humiliate her, and otherwise focus his negative attention towards her.

133.    Ms. Witherspoon lost credit in her 2019 and 2020 evaluations for a decline in her participation in the "internal life" of Sia because she physically and mentally could not bear the thought of enduring another hostile encounter with Mr. Connor.

134.    Sia's unwillingness to investigate Ms. Witherspoon's complaint and timely respond to it has exacerbated her anxiety about the hostile work environment she faces at Sia.  Instead of giving Ms. Witherspoon redress, Sia's sham complaint procedure demonstrated that she cannot achieve redress, equity, or safety at Sia.

135.    On December 6, 2019, at Sia's holiday party, Mr. Gold (a manager) told Ms. Witherspoon that "Dan [Connor] has it out for you." When Ms. Witherspoon asked Mr. Gold for more details, he did not want to elaborate because other people were within earshot. He also requested that she not tell anybody that he told her this. Mr. Gold's warning, which Ms. Witherspoon had every reason to believe, further aggravated her state of fear and anxiety.

136.    Ms. Witherspoon has made several attempts over the years to determine what legitimate business reason could be driving Mr. Connor's bias and hostility. Mr. Connor has acknowledged that Ms. Witherspoon thinks that he treats her unfairly, but he has blamed Ms. Witherspoon for deserving her own mistreatment. Neither Mr. Connor nor Ms. Bhagwandin or others in senior leadership positions have articulated any legitimate business or performance-based reason for Mr. Connor's behavior. Instead, Ms. Witherspoon's attempts to resolve conflicts were met with screaming, intimidation, ridicule, and derogatory comments.

137.    Given the hostile responses Ms. Witherspoon has received when she raised complaints about her disparate pay and Mr. Connor's treatment, she is afraid to discuss her career advancement with senior management at Sia, as they have shown and told Ms. Witherspoon time and again that her success and safety are of no interest to them.

**B.    Damage to Physical Health**

138.    Ms. Witherspoon has experienced chronic stress and illness due to Mr. Connor's hostility.  During the months of October and November 2017, Ms. Witherspoon frequently

vomited in the bathroom at Scotia due to stress and fear caused by Mr. Connor.  Ms. Witherspoon

was sick with strep throat or the flu every month from October 2017 – March 2018. Prior to

October 2017, there was never a time in Ms. Witherspoon's life when she had been sick for months

on end. The only new and significant variable in Ms. Witherspoon's life during this time was the

daily stress and anxiety she experienced due to Mr. Connor's hostility. By the end of March 2018,

Ms. Witherspoon was in constant pain, and the condition of her throat had deteriorated so

significantly that she was referred to an ear, nose, and throat specialist for evaluation. An ulcer had

formed in the back of her throat, which the specialist initially thought could be an early sign of

throat cancer. The specialist ultimately determined the ulcer was benign and said it had formed as

a result of Ms. Witherspoon's chronic sickness and stress.

### C.      Pay Gap Increasing

139.     As the result of Mr. Connor's sex and race biases, harassment, disparate treatment,

and retaliation, the pay gap has noticeably widened between Ms. Witherspoon's salary and that of

her peers and colleagues. Those whose salaries were comparable to or lower than hers at the time

they were hired now have salaries that surpass hers. For example, Mr. Davidson joined Sia two

weeks before Ms. Witherspoon, and they both started with the title consultant.  Mr. Davidson's

starting salary was approximately $68,000, and Ms. Witherspoon's was $82,250. As of January 1,

2021, Mr. Davidson's salary is approximately $120,000-$132,000 (an increase of $52,000-

$64,000 since he was hired in 2017). Comparatively, Ms. Witherspoon's salary has only increased

by $21,500 over this same period of time, despite her and Mr. Davidson having similar leadership

roles and responsibilities internally at Sia and externally on projects; having comparable

performance metrics; and Ms. Witherspoon being more marketable to clients due to her being a

licensed attorney and being an AML subject matter specialist. This disparity (which is due to others

receiving higher increase amounts for promotions and cost-of-living and receiving off-cycle increases for non-merit-based reasons) does not include lost wages due to Ms. Witherspoon receiving lower bonuses.

140.    The slower rate of salary increases, and lost wages mean that Ms. Witherspoon has reduced lifetime earnings, less money to support herself and her family, less money to save and invest in her future, and less money to spend on goods and services.

141.    Ms. Witherspoon's compensation disparity aligns with the national U.S. trend of Black women earning less than men (most notably White men) and White women. Using uncontrolled data to align with Sia's uncontrolled approach to pay practices, according to median earnings data for full-time, year-round workers from the U.S. Census Bureau's 2019 American Community Survey, Non-Hispanic White women earn 78.1% of what non-Hispanic White men do, while Black women earn 61.1%. When compared to Black men, Black women earn 90.7% of what men earn. According to PayScale's 2020 compensation data, for every $1.00 that White men earned, Black women earned $0.76, Black men earned $0.88, and White women earned $0.81. Data shows that even when Black women have the same job title as others, they still earn less. For example, women managers earn less than men managers. Black women earned $60,936, White women earned $62,624, and White men earned $81,402.

142.    Based on Mr. Connor's personal attacks and insults when Ms. Witherspoon raised concerns about pay inequity, his refusal to listen or take accountability, and Sia's denial in its answer to the Commission that pay inequity exists (which goes against Sia's own data and data on national and systemic trends), Sia has demonstrated its willingness to permit race and sex disparities in pay to persist. Sia has not taken practical steps to investigate and remediate its pay practices, such as conducting a pay audit to uncover bias in its pay decisions, or reviewing or

creating policies regarding starting pay, allowable pay differences, merit pay increases and promotional pay increases to root out patterns of bias. Sia's conduct has perpetuated the gender and racial wealth gap.

### D.    Delayed Promotion Track

143.    Mr. Connor's harassment, adverse employment actions, and retaliation have impeded Ms. Witherspoon's career advancement, including her promotion rate. Ms. Witherspoon is now about 1-2 year behind in the promotional track, and she is years behind in corresponding compensation. Ms. Witherspoon started around the same time, at the same title, as several of her peers and colleagues. Ms. Witherspoon has been given comparable or more challenges roles and responsibilities, has demonstrated her ability to self-manage and manage others, has demonstrated comparable skillsets, and has a higher-level of subject matter expertise and knowledge. Despite this, Ms. Witherspoon's male peers and colleagues have been promoted at faster rates. As a result, they are making more money now, and have greater future earnings potential, than her.

144.    Ms. Witherspoon's delayed promotion track also follows national statistics of slower promotions rates for Black women. LeanIn.Org and McKinsey & Company's 2020 study, *Women in the Workplace*, the largest study on the state of women in corporate America, found that for every 100 men promoted to manager, only 85 women were promoted, and only 58 Black women were promoted. The study also found that managers are less likely to promote the accomplishments of Black women. Only 35 percent of Black women say that their managers promote their contributions to others, compared to 46 percent of white women and 46 percent of men. Additionally, the study found that when women negotiate for promotions and raises, they are often seen unfavorably, and receive them less than men who negotiate. According to the study, women who negotiate are 30% more likely than men who negotiate to receive negative feedback,

for example, "too aggressive," or "unprofessional." The study concluded that reason for this pushback lies in gender bias and unconscious assumptions about women.

### E.   Reduced Professional Growth

145.   Due to Mr. Connor's discriminatory treatment and retaliation, Ms. Witherspoon's professional growth has been stunted.  Mr. Connor has blocked Ms. Witherspoon from attending professional development conferences.   Moreover, he has deprived Ms. Witherspoon of the opportunity to obtain professional certifications, such as the Project Management Professional certification that was offered to certain male colleagues (Mr. Brulinski, Mr. Davidson, and Mr. Baillet) in 2019.

146.   In addition, Ms. Witherspoon has been unfairly deprived of roles that are uniquely suited to her given her legal background. In October 2019, a new project spawned from the existing project at Scotia, which entailed reviewing legal contracts. Because Ms. Witherspoon is a licensed attorney who has familiarity with contracts, the person who generated the business (Cindy Li) had her in mind to lead the project. Despite this, Mr. Becquet chose Mr. Brulinski to lead the project, even though he had no legal experience or knowledge about contracts. Being passed up for opportunities does not allow Ms. Witherspoon to demonstrate her range of capabilities, which significantly contributes to delayed promotions.

### F.   Harm to Professional Reputation and Relationships

147.   Mr. Connor's smear campaign against Ms. Witherspoon was intended to damage her standing and malign her professional character. Upon information and belief, the false rumors spread by Mr. Connor influenced the comments and grades Ms. Witherspoon received in her appraisals and damaged her reputation in a company where one's reputation is key to being accepted and staffed by project managers on their assignments and being billable. This increased

Ms. Witherspoon's anxiety because she feared not being staffed on future projects, which would make her unprofitable to Sia, and carries with it the risk of job termination, as this is ultimately the primary consideration for remaining employed.

## AS AND FOR A FIRST CAUSE OF ACTION

**Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, against Sia and Sia Partners**

148.  Plaintiff repeats and re-alleges paragraphs 1 through 147 above, as if fully set forth herein.

149.  The actions of Defendants Sia and Sia Partners constitute disparate treatment discrimination based on race and sex, and constitute retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.*

## AS AND FOR A SECOND CAUSE OF ACTION

**Violation of the New York State Human Rights Law, New York Executive Law §§290, 296, against Sia, Sia Partners, and Daniel Connor**

150.  Plaintiff repeats and re-alleges paragraphs 1 through 149 above, as if fully set forth herein.

151.  The actions of the Defendants Sia, Sia Partners and Mr. Connor constitute discrimination based on race and sex, and constitute retaliation, in violation of New York Executive Law §§290 and 296.

## AS AND FOR A THIRD CAUSE OF ACTION

**Violation of the New York State Human Rights Law, New York Executive Law §§290, 296(6), against Daniel Connor**

152.  Plaintiff repeats and re-alleges paragraphs 1 through 151 above, as if fully set forth herein.

153.  The actions of Defendant Mr. Connor constitute aiding and abetting discrimination

on the basis of race and sex in violation of New York Executive Law §§290 and 296(6).

## AS AND FOR A FOURTH CAUSE OF ACTION

**Violation of the New York City Human Rights Law, Admin. Code §8-101, *et seq.*, against Sia, Sia Partners and Daniel Connor**

154.    Plaintiff repeats and re-alleges paragraphs 1 through 153 above, as if fully set forth herein.

155.    The actions of Defendants Sia, Sia Partners and Mr. Connor constitute discrimination based on race and sex, and constitute retaliation, in violation of the New York City Administrative Code §8-101, *et seq.*

## AS AND FOR A FIFTH  CAUSE OF ACTION

**Violation of the New York City Human Rights Law, Admin. Code §8-107(6), against Daniel Connor**

156.    Plaintiff repeats and re-alleges paragraphs 1 through 155 above, as if fully set forth herein.

157.    The actions of Defendant Mr. Connor constitute aiding and abetting discrimination on the basis of race and sex in violation of New York City Administrative Code §8-107(6).

## AS AND FOR A SIXTH CAUSE OF ACTION

**Violation of the Equal Pay Act, 29 U.S.C. §206(d), against Sia and Sia Partners**

158.    Plaintiff repeats and re-alleges paragraphs 1 through 157 above, as if fully set forth herein.

159.    The actions of Defendants Sia and Sia Partners constitute unequal pay based on sex in violation of the Equal Pay Act, 29 U.S.C. §206(d).

## AS AND FOR A SEVENTH CAUSE OF ACTION

**Violation of New York Labor Law § 194, *et seq.* against Sia and Sia Partners**

160.    Plaintiff repeats and re-alleges paragraphs 1 through 159 above, as if fully set forth herein.

161.    The actions of Defendants Sia and Sia Partners constitute unequal pay based on sex in violation of New York Labor Law § 194, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this court will:

A.    Issue a declaration that Defendants violated Plaintiff's rights under federal, state and local law;

B.    Grant injunctive relief in the form of retroactive promotion, fair appraisals and a non-discriminatory appraisal process for each year since 2017;

C.    Award equitable relief in the form of back pay;

D.    Award liquated damages of 100% of unpaid wages, as provided for in the Equal Pay Act, 29 U.S.C. §216(b) and/or 300% of unpaid wages, as provided for by New York Labor Law §198.

E.    Award compensatory damages for the injuries Plaintiff suffered by reason of Defendants' unlawful conduct, including damages for the pain, suffering, emotional distress, loss of dignity, humiliation, and damage to reputation and livelihood endured by Plaintiff in amounts that are fair, just and reasonable, to be determined at trial;

F.    Award Plaintiff punitive damages in an amount to be determined at trial;

G.    Award Plaintiff all reasonable attorneys' fees and costs of this action and fees for any work required to ensure compliance with any order of injunctive relief, as provided for in 42 U.S.C. §1988, 42 U.S.C. §2000e-5(k), 29 U.S.C. §216(b) and

State and Local law; and

H.      Grant such other and further relief as the Court determines to be just and proper.


Dated:  New York, NY
        June 25, 2021

_____
Dana E. Lossia
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, NY 10011
(212) 627-8100
dlossia@levyratner.com

*Attorneys for Brittney Witherspoon*